| | | |
|---|---|---|
| BRADLEY DENNISTON, | : | Case No. 3:17-cv-56 |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | District Judge Walter H. Rice |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Bradley Denniston brings this case challenging the Social Security

Administration's denial of his applications for period of disability, Disability Insurance

Benefits, and Supplemental Security Income.  He applied for benefits on May 14, 2014,

asserting that he could no longer work a substantial paid job.  Administrative Law Judge

(ALJ) Paul R. Armstrong concluded that he was not eligible for benefits because he is not

under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #6), the

Commissioner's Memorandum in Opposition (Doc. #7), Plaintiff's Reply (Doc. #8), and

the administrative record (Doc. #5).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Armstrong's non-disability decision.

## II. <u>Background</u>

Plaintiff asserts that he has been under a "disability" since February 2, 2014. He was forty-seven years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and according to ALJ Armstrong, "a wonderful work history." (Doc. #5, *PageID* #109); *see* 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4). [2]

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Armstrong if he could work today, he "definitely" would. (Doc. #5, *PageID* #103). He explained that he enjoyed working and when he was able to work, did not miss a day. *Id.* When ALJ Armstrong asked, "All the stuff you did was really heavy work. You're lifting 50 pounds and stuff. Why couldn't you do a light job? Plaintiff responded, "That's all I've done my whole life. That's all I know. That's all I know how to do. I don't know nothing else." *Id.* at 103.

Plaintiff further explained, "I try to work and do things that I was able to do in the past[,] … my breathing won't let me. I'm not able to continue to go like I was before. I get out of breath every time I try to do something." *Id.* at 110-11. Plaintiff smokes cigarettes but has significantly reduced the number he smokes per day: At the beginning

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

of 2015, he smoked two packs a day and by the time of the hearing in December 2015, he was smoking three to six cigarettes per day. *Id.* at 86. Since cutting back, he has not noticed a difference in his breathing. *Id.* at 98-99. He has difficulty breathing in dusty environments and when the temperature is very hot or very cold. *Id.* at 99.

In 1990, Plaintiff fell approximately sixty feet and hurt his right ankle and back. *Id.* at 91, 108. At first, the doctors were unable to find anything wrong with his ankle. *Id.* at 91. However, a year and a half later, another doctor found that it had broken and started to heal incorrectly. *Id.* As a result, Plaintiff underwent surgery. *Id.* His surgeon informed him that he had arthritis in his ankle and although the surgeon removed it, it was likely to return. *Id.* Plaintiff also has back pain "[e]veryday, all day" because of the fall. *Id.* at 96. He sees a pain management doctor once a month at Dayton Pain Center. *Id.*

Plaintiff sees a psychiatrist at Darke County Mental Health. *Id.* at 101. He originally sought treatment "[f]or depression, more or less because I wasn't able to do the things I've been able to do in the past …." *Id.* at 110-11. He used to see a case worker—Dick Baker—but Mr. Baker retired and Darke County has not been able to find Plaintiff a new case worker. *Id.* at 101-02. Plaintiff "had a couple of different periods during [the] hearing where [he's] been emotional and [he's] cried." *Id.* at 111. This happens to him several times a week "because I got somebody else doing things for me and I usually do it myself. Never been dependent on nobody." *Id.*

Plaintiff falls asleep three to four times a day for fifteen to twenty minutes at a time. *Id.* at 99-100. When he was at work, he sometimes nodded off. *Id.* at 100.

Plaintiff once fell asleep while driving to work and "hit a state trooper head on." *Id.* at 92. He had a sleep study done and now uses a BiPAP machine. *Id.* at 92. Even with the machine, Plaintiff still nods off. *Id.* at 100.

Plaintiff is not able to read. *Id.* at 88. When asked by the ALJ if he had ever learned to read at all, Plaintiff explained: "I've tried. I went to school everyday. … I gave my effort. When I was younger in [] Kindergarten, 1st, 2nd and 3rd grade they didn't know I had 5 percent hearing in both my ears. … So I wasn't able to hear. That's when you learn to read and write." *Id*. The ALJ recommended he go to the public library so "older people" could help him learn to read. *Id.* at 89. Plaintiff related a troubling story: "My grandbaby comes home from 1st grade with a 1st grade book, and he asked me what these words are. And I tell him I can't read them, I try to read them, and I can't read them for him. You know how bad that feels[?]" *Id*. (The ALJ responded with an oddly irrelevant personal story.)

Plaintiff last worked as a laborer at Fram Oil Filter Company. *Id.* at 86. After a machine assembled oil filters, he was supposed to sort the good parts from the bad. *Id.* at 87. He had "trouble keeping up with the assortment of stuff." *Id*. The job also required Plaintiff to complete "a lot of paperwork" and he was not able to. *Id.* at 88. He was let go, after working 89 days, "for not being able to keep up with it." *Id.* at 86.

Plaintiff resides with his long-time girlfriend. *Id.* at 93. She has one daughter and grandchildren. *Id.* at 94. Plaintiff's girlfriend helps him put on and tie his shoes because he loses his breath when he bends over: "I stand up. I get dizzy. I've stood up before and fell over, passed out doing that. *Id.* at 96-97. Plaintiff has problems sitting for long

4

periods of time.  *Id.* at 97.  He can only sit comfortably for about fifteen minutes.  *Id.* at 98.  If he does not stand up after that, his lower back and legs go numb and get tingly.  *Id.*

Plaintiff estimated that he can lift "[m]aybe 10 pounds" and can walk "[c]omfortably, maybe a block."  *Id.* at 94.  He has a home exercise program where he "can use rubber bands and stuff like that to keep exercise movements and stuff like that in [his] legs and arms."  *Id.* at 94-95.  He also tries to walk around his house.  *Id.* at 95.

Plaintiff has a driver's license.  *Id.* at 88.  When he obtained his license, the driving test was read to him.  *Id.*  Since his accident, he has obtained another vehicle from his brother.  *Id.* at 93.  He generally only drives two to three times a week.  *Id.* at 98.  Plaintiff used to ride motorcycles.  *Id.* at 93.  He had to get rid of his Harley Gold Wing—"a dynamite machine," according to the ALJ—because he was unable to hold it up.  *Id.*

## B.  Medical Opinions

### i.  Sherry Adkins, M.D.

On February 12, 2015, Dr. Adkins, Plaintiff's primary-care physician, indicated Plaintiff should be restricted from operating heaving machinery—including vehicles—due to a history of syncope.  *Id.* at 768.

### ii.  M. Robert Maher, D.P.M.

Dr. Maher, Plaintiff's podiatrist, opined on May 8, 2012, that Plaintiff was limited to working eight hours a day, five days a week, for four weeks.  *Id.* at 465.

### iii.     Martti E. Kahkonen, M.D.

On August 7, 2014, Dr. Kahkonen completed a consultative exam and documented largely normal findings.  *Id.* at 477-82.  He noted Plaintiff's teeth were in "poor repair" and his lungs revealed rhonchi.  *Id.* at 479.  Dr. Kahkonen assessed no functional or lifting/carrying restrictions.  *Id.* at 481-82.

### iv.     Damian M. Danopulos, M.D.

Dr. Danopulos examined Plaintiff and reviewed some of his records on July 24, 2014.  *Id.* at 932-48.  His "objective findings were 1) right ankle arthralgias, if any, 2) cervical spine arthralgias, 3) lumbar spine minimal arthritic changes in the lower lumbosacral spine area and 4) history of depression, which was already evaluated by a Social Security psychologist."  *Id.* at 836.  He concluded that Plaintiff's physical impairments—"except has mild emphysema"—do not interfere with his ability to complete work-related activities and "a semi-sedentary job would be fitting for him."  *Id.* at 837.  He cautioned, "This assessment was based on his complaints, history given by the claimant and careful clinical examination including the review of available medical records.  It is not per se a recommendation to make or enforce a decision."  *Id.*

### v.     Alan R. Boerger, Ph.D.

Dr. Boerger evaluated Plaintiff and administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) on July 16, 2014.  *Id.* at 824-30.  Dr. Boerger diagnosed cognitive disorder not otherwise specified (NOS) and depressive disorder NOS.  *Id.* at 829.  He assigned a global assessment of functioning (GAF) score of fifty-five.  *Id.*  Dr. Boerger summarized Plaintiff's results from the WAIS-IV:

Mr. Denniston does display moderate variability in his cognitive performance.  His highest Index score is on Perceptual Reasoning which reflects visual motor and nonverbal type intellectual abilities. … His lowest Index score is on Processing Speed where his score falls more than 2 standard deviations below the mean.  Processing Speed reflects ability to maintain attention to perform simple repetitive tasks.  His score on Verbal Comprehension which reflects verbal intellectual abilities and academic aptitude falls more than 1 1/3 standard deviations below the mean.  Working Memory which reflects ability to retain information to perform immediate tasks also falls more than 1 1/3 standard deviations below the mean. … He does have an irregular and limited educational background and was apparently hampered early in his school years by hearing loss.

*Id.* at 828-29.

Dr. Boerger opined, Plaintiff "may have some difficulty understanding complex work instructions because of limited intellectual abilities particularly in the verbal area. He may likewise have some difficulty with retaining instructions as reflected in his low score on the Working Memory Index ….  He was able to recall 4 of 4 objects after 5 minutes and could recall 6 digits forward and 3 backwards."  *Id.* at 830.  Further, he "may have difficulty with maintaining focus and attention in performing repetitive tasks as reflected in his low score on the Processing Speed Index of the WAIS-IV ….  He was likewise unable to complete Serial 7's."  *Id.*  Plaintiff's "combination of depression and variable cognitive abilities may limit his ability to tolerate work pressures in the work setting."  *Id.*  However, there were no indications Plaintiff would have trouble relating to coworkers and supervisors.  *Id.*

### vi.  David Demuth, M.D., & Tonnie Hoyle, Psy.D.

Dr. Demuth reviewed Plaintiff's records on July 29, 2014.  *Id.* at 119-32.  He found Plaintiff had three severe impairments—COPD, organic brain syndrome, and affective disorders—and one non-severe impairment—inflammatory arthritis.  *Id.* at 124.  He has a mild restriction in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.  *Id.*

Dr. Demuth opined Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions.  *Id.* at 128.  Further, Plaintiff's "mental health issues would cause reduced concentration and stress tol[erance] but [Plaintiff] retains the ability to carry out 1-3 step instructions that are static in nature."  *Id.* at 129.

On December 9, 2014, Dr. Hoyle reviewed Plaintiff's record and affirmed Dr. Demuth's assessment.  *Id.* at 149-63.

### vii.  Lynne Torello, M.D., & William Bolz, M.D.

On August 27, 2014, Dr. Torello reviewed Plaintiff's records.  *Id.* at 119-32.  She opined Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently.  *Id.* at 126.  He could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours.  *Id.*  He could stoop frequently and must avoid concentrated exposure to fumes, odors, gases, poor ventilation, etc.  *Id.* at 127.  Dr. Torello concluded that Plaintiff is not under a disability.  *Id.* at 131-32.

Dr. Bolz reviewed Plaintiff's records on November 29, 2014 and affirmed Dr. Torello's assessment with one alteration: Dr. Bolz opined Plaintiff must avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc. *Id.* at 149-63.

### III. <u>**Standard of Review**</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to

support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Armstrong to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

| Step 1: | Plaintiff has not engaged in substantial gainful employment since February 2, 2014. |
| Step 2: | He has the severe impairments of Chronic Obstructive Pulmonary Disease (COPD), Degenerative Disc Disease, and Degenerative Joint Disease. |

| | |
|---|---|
| Step 3: | He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. |
| Step 4: | His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … except claimant must avoid concentrated exposures to noxious fumes, odors, or respiratory irritants; and must avoid all extreme temperatures and humidity." |
| Step 4: | He is unable to perform any of his past relevant work. |
| Step 5: | He could perform a significant number of jobs that exist in the national economy. |

(Doc. #5, *PageID* #s 60-74).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 74.

## V.   **Discussion**

Plaintiff contends that the ALJ failed to identify obesity as a severe impairment at Step Two and to consider it at all stages of the sequential evaluation.  Further, the ALJ erred in finding that Plaintiff's pulmonary impairment did not meet or equal Listing § 3.02 and in weighing the medical source's opinions.  Plaintiff also argues the ALJ's hypothetical question to the vocational expert was incomplete.

The Commissioner maintains that the ALJ properly considered Plaintiff's impairments at Step Two; determined that Plaintiff's COPD did not meet or medically equal Listing § 3.02; weighed the medical opinions of record; and relied on the vocational expert's testimony.

## A.     Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to

any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id.*

*Dr. Adkins*

ALJ Armstrong does not say how much weight he assigned Dr. Adkins's opinions. Instead, he asserts, "[i]n evaluating the factors under 20 [C.F.R. §§] 404.1527 and 416.927, the undersigned does not find that the clinical findings or treatment notes support giving Dr. Adkins' opinion controlling or great weight." (Doc. #5, *PageID* #69). The ALJ's discussion of Dr. Adkins's opinion contains very little concerning the treating physician rule, and he did not explicitly address the two conditions under the treating physician rule. Moreover, the ALJ makes no attempt to distinguish between application of the treating physician rule and application of the factors. There are several errors in the ALJ's analysis. First, the "factors are properly applied only *after* the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)) (emphasis added). If at all, ALJ Armstrong addressed the treating physician rule at the same time as the factors. Second, the uncertainty of whether ALJ Armstrong addressed the conditions of the treating physician rule conflicts with the requirement that the decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. R. 96-2p, 1996 WL 374188, at *5. Third, by using the same standard to weigh treating physicians' opinions and other physicians' opinions, he fails to recognize the deference given to treating physicians' opinions. *Id.* at *4 ("In many cases, a treating source's

13

medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

And, even if Dr. Adkins' opinion is not entitled to controlling weight, "the ALJ must still determine how much weight is appropriate by considering a number of factors …." *Blakley,* 581 F.3d at 406 (citing *Wilson,* 378 F.3d at 544; 20 C.F.R. § 404.1527(d)(2)); *see* Soc. Sec. R. 96-2p, 1996 WL 374188, at *4 ("Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927."). The ALJ only addresses one other factor: "Dr. Adkins's instructions are somewhat consistent with the overall objective record in that it considers objective findings from [Plaintiff's] pulmonary function exams." (Doc. #5, *PageID* #69). This statement, however, seems to contradict the ALJ's previous statement that Dr. Adkins's opinion was not supported by clinical findings or treatment notes. Further, if the opinion is somewhat consistent with record, it would be expected that Dr. Adkins's opinion would be reflected in the ALJ's assessment of Plaintiff's residual functional capacity. It is not, and the ALJ fails to adequately explain why. The one reason provided by the ALJ does not amount to "good reasons" for rejecting Dr. Adkins's opinion. "The failure to provide 'good reasons' for not giving [the treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule…." *Gayheart,* 710 F.3d at 377.

### *Dr. Boerger*

The ALJ assigned consulting psychologist Dr. Boerger's opinion some weight: "[B]ased on the scant evidence in the record as to [Plaintiff's] mental functioning, the

undersigned would afford some weight to Dr. Boerger's opinion based on its effectiveness of articulating [Plaintiff's] condition." (Doc. #5, *PageID* #70). The ALJ also credited Dr. Boerger's assessment as "consistent with his own clinical findings[.]" *Id.* Despite finding it consistent, the ALJ reached a different conclusion—"the undersigned does not find any marked or even moderate cognitive limitations established by the mental status examination findings." *Id.* He further explained that he "does not believe that those cognitive deficiencies noted would severely interfere with certain work related functioning when compared to the totality of the evidence presented in the record." *Id.* In support of this conclusion, the ALJ pointed out that Plaintiff is able to socialize and manage his own funds. *Id.* at 70 (citing Exhibit 17F\6-7). Further, he "has exhibited some visual motor and nonverbal type intellectual abilities on examination[.]" *Id.* Finally, Dr. Boerger assigned a GAF score of 55, which—according to the ALJ— "would suggest that [Plaintiff's] emotional instabilities are not as severe as [Plaintiff] would allege." *Id.* The ALJ's examples, however, are consistent with Dr. Boerger's opinions. For example, Plaintiff's ability to socialize is consistent with Dr. Boerger's opinion that there were no indications Plaintiff would have difficulty relating to coworkers or supervisors.

Likewise, Dr. Boerger's opinion is consistent with the medical evidence of record. For instance, Dr. Adkins, Plaintiff's family-care physician, began treating Plaintiff's anxiety and depression in September 2014. *Id.* at 441. At that time, she noted that Plaintiff's anxiety symptoms include feelings of impending doom, light headedness, increased perspiration, shakiness, dizziness, and irritability. *Id.* He experienced these

symptoms several times a day.  *Id.*  He also felt down, depressed, or hopeless nearly every day and he had little interest or pleasure in doing things.  *Id.* at 444.  She prescribed Prozac.  *Id.* at 443.  Dr. Adkins also noted that Plaintiff was seeing a counselor but was not able to see the physician for months because of a backlog.  *Id.*  Until at least July 2015, she consistently documented his continuing mental health struggles.  *Id.* at 696, 700, 779, 783.

Between June 2014 and September 2015, William Baumann, Plaintiff's social worker, and Dr. Cheng Pan, Plaintiff's psychiatrist, consistently assigned Plaintiff a GAF score of 51.  *Id.* at 402, 639, 644, 649.  In February 2015, Dr. Pan indicated Plaintiff had limited eye contact, was withdrawn and preoccupied, and displayed psychomotor retardation.  *Id.* at 636.  Further, he opined Plaintiff's fund of knowledge and abstraction was inadequate, his estimated intelligence was below average, and his mood and affect were anxious, blunted, constricted, depressed, indifferent, and restricted.  *Id.* at 638.

Although Dr. Boerger's opinion is consistent with the medical evidence of record and the ALJ assigned it some weight, the ALJ did not incorporate any of his mental restrictions into Plaintiff's residual functional capacity.  The ALJ's bare-bones assessment of Dr. Boerger's opinions constitutes error under the Regulations:  "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…."  20 C.F.R. § 404.1527(e)(2)(ii); *see* Soc. Sec. R. 96–6p, 1996 WL 374180, at *2 ([ALJs] … are not bound by findings made by State agency or

other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.").

*Dr. Kahkonen*

The ALJ assigned the opinion of Dr. Kahkonen, a consultative examiner for the Ohio Department of Job and Family Services, "significant weight." (Doc. #5, *PageID* #70). The ALJ found, "Dr. Kahkonen's assessment is aligned with the objective medical record as a whole regarding the severity and limiting effect of [Plaintiff's] back and ankle condition." *Id.* The ALJ does not identify what evidence aligns with Dr. Kahkonen's opinion.

Further, the ALJ does not acknowledge any deficiencies in Dr. Kahkonen's opinion. For example, Dr. Kahkonen, when asked if any of Plaintiff's "alleged disabling opinions result[ed] in surgery," he indicated they had not. *Id.* at 479. This is not consistent with Dr. Maher's notes indicating Plaintiff had a surgical scar visible on his right ankle and foot. *Id.* at 374. Further, Dr. Kahkonen provides no explanation for any of his opinions. *Id.* at 477-82; *see* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). This flies in the face of the Regulations: "because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." 20 C.F.R. § 404.1527(c)(2).

*Non-Examining Source Opinions*

The ALJ does not distinguish between the medical and psychological consultants. Nonetheless, noting that he "considered the totality of the evidence, including records not available to the State agency consultant at the time of the assessment[,]" the ALJ assigned their opinions "some weight as they are generally consistent with the claimant's current level of functioning. The undersigned has made the appropriate modifications based on new evidence." (Doc. #5, *PageID* #71). The ALJ does not identify what new evidence he is referring to or how it differs from their opinions. The ALJ accurately observed, "Although State agency consultants are non-examining, they are professionals in their field and well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act, as amended." *Id.*

The ALJ does acknowledge the State agency consultants (Dr. Demuth and Dr. Hoyle) "found mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace[.]" (Doc. #5, *PageID* #71) (citing Exhibits 1A, 2A, 5A, 6A). He fails, however, to explain why he found Plaintiff had no restriction of activities of daily living and a mild limitation in concentration, persistence, or pace. The ALJ also does not explain why he disagreed with Dr. Demuth and Dr. Hoyle's finding that Plaintiff's severe impairments included organic brain syndrome and affective disorders or that Plaintiff's inflammatory arthritis was non-severe. And, he does not explain why Plaintiff's RFC contains no mental limitations when Dr. Demuth and Dr. Hoyle opined, "Plaintiff's "mental health issues would cause reduced concentration and stress tol[erance] but

[Plaintiff] retains the ability to carry out 1-3 step instructions that are static in nature." *Id.* at 129.

Similarly, the ALJ recognized that the State agency consultants (Dr. Torello and Dr. Bolz) "limited claimant to a medium lifting restriction; with postural limitations including frequent stooping[.]" *Id.* at 71 (citing Exhibits 1A, 2A, 5A, 6A). However, he fails to address why he limited Plaintiff to light work but did not limit Plaintiff's ability to stoop to frequently. And, the ALJ does not recognize that although Dr. Torello opined Plaintiff must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc., Dr. Bolz opined Plaintiff must avoid even moderate exposure to these irritants.

Despite giving "some weight" to the opinions of the State agency consultants, the ALJ largely ignored their opinions in determining Plaintiff's residual functional capacity. As explained above, when a treating source's opinion is not given controlling weight, ALJs must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…." 20 C.F.R. § 404.1527(e)(2)(ii); *see* Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996). The ALJ's failure to do so in this case constitutes error.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

## B.    Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal

criteria mandated by the Commissioner's Regulations and Rulings and by case law; and

to evaluate Plaintiff's disability claim under the required five-step sequential analysis to

determine anew whether Plaintiff was under a disability and whether his applications for

Disability Insurance Benefits and Supplemental Security Income should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff Bradley Denniston was under a "disability" within the meaning of the Social Security Act;

3.    This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.    The case be terminated on the Court's docket.

January 9, 2018                                         *s/Sharon L. Ovington*
                                                        Sharon L. Ovington
                                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).